*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* PEDERSON, Minors.

FOR PUBLICATION
February 13, 2020
9:00 a.m.

No. 349881
Presque Isle Circuit Court
Family Division
LC No. 17-000007-NA

Before: CAMERON, P.J., and SHAPIRO and SWARTZLE, JJ.

CAMERON, J.

Respondents appeal as of right the trial court's order terminating their parental rights to their two minor children[1] under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood that the children will be harmed if returned to the parents). We affirm.

## I. FACTUAL BACKGROUND

Respondents' parental rights were terminated due to their neglect of their minor children over the course of several years. In March 2017, the Department of Health and Human Services filed a petition seeking the children's removal. The petition alleged that respondents had been the subjects of Child Protective Services complaints on 18 prior occasions, with those prior complaints regarding both of respondent-mother's other children, who had since become adults, and the minor children at issue in this case. Petitioner also alleged that over the course of several years, numerous caseworkers had visited respondents' home and found it in appalling condition. During this time, infestations of spiders and cockroaches had been observed, as had mold and flooding. Cockroaches had been observed crawling over food in respondents' refrigerator. The daughter was significantly overweight, her bedroom had an "unbearable" odor of urine, and her mattress was so saturated with urine that it had soaked through and inundated the floorboards. The electricity had been shut off at times for nonpayment of outstanding bills, and the plumbing was

---

[1] We refer to the minor children as "the daughter" and "the son" in this opinion.

nonfunctional at times. Caseworkers discovered animal feces and urine in the basement. The minor children had also been habitually absent from school, often without excuse, and had been sent to school with poor hygiene, noticeable body odor, "greasy" hair, and ill-fitting, unwashed clothing that sometimes smelled strongly of urine or feces. As a result, the children had been bullied by their peers. Petitioner alleged that services and assistance were provided to respondents but that they had failed to rectify the problems. After a preliminary hearing, the trial court authorized the petition and ordered the children removed from respondents. The children were eventually placed in a foster home in Traverse City. After their removal, respondents' son was assessed and diagnosed with autism spectrum disorder.

At a pretrial hearing on April 21, 2017, respondents' attorney informed the trial court that he had spoken with respondents "at length" the previous day and that respondents wished to enter a plea to jurisdiction rather than proceed to a trial. Respondents' attorney stated:

> We went over the petition and picked out portions we believe . . . will allow the Court to take jurisdiction. I explained to [respondents] if the Court takes jurisdiction then they're going to have to abide by the conditions and terms of the parent agency treatment plan, as well as recommendations . . . after the psychological [evaluations are] done. They are both in agreement with that.
>
> I explained to them that they would have a right to a trial on the issue of jurisdiction before the Court or jury. They've agreed to waive those—or that right. I've also went over [sic] the rights to have witnesses called and subpoena witnesses and things of that sort.
>
> They are going to tender a plea this morning, understanding that if they don't comply with the case service plan, eventually the Court will entertain termination of parental rights.

The trial court subsequently gave respondents an abbreviated advice of rights, stating as follows:

> I just want to ensure that you do understand that if you do enter a plea, that is if you admit allegations that enables the Court to take jurisdiction, that you then are submitting to the jurisdiction of the Court. You must participate in and benefit from a case service plan, an initial admonition from the Court is going to be we want you to be reunified with your children, however, if you do not cooperate with and benefit from the provisions of the case service plan, you're risking termination of your parental rights.

When asked whether they understood, both respondents answered "Yes." Respondents also indicated that they were entering their pleas of their "own free will." The trial court accepted respondents' pleas. As summarized by respondents' attorney, the factual basis for the pleas was respondents' joint admission that services had been "provided to them over the course of the last couple of years," "those services did not result in an improvement of their home situation," they had "neglected their children because the home was not fit for them because it was unsanitary," and they were facing eviction.

Respondents were subsequently convicted of fourth-degree child abuse, MCL 750.136b(7), arising out of the same circumstances alleged in the initial petition in this case. Respondents were sentenced to 90 days in jail. Respondents indicated that they did not want to arrange any face-to-face visitation with the minor children while incarcerated. When respondents were released from jail in November 2017, they were homeless, unemployed, and actively seeking public assistance. They moved into a motel and made arrangements to move into an apartment a few weeks later.

According to the caseworker, Amanda Fisher, as of a review hearing on May 14, 2018, the children were doing well in foster care, and respondents had been making steady progress. Respondents had completed parenting classes, they had obtained suitable housing, they were engaging in therapy, and they were acting appropriately during supervised weekly visits with the children, which they had attended consistently. Based on such progress, Fisher recommended that petitioner be given discretion to permit unsupervised visitation. However, the daughter had asked for an opportunity to meet with respondents before any unsupervised visitation was permitted, and the daughter's therapist offered to perform family counseling sessions. The trial court agreed and entered a commensurate order. In an attempt to qualify for a housing subsidy, however, respondents intentionally became homeless. Consequently, no unsupervised visits ever occurred.

In July and August 2018, the daughter's therapist, Paula Kilcherman, held several family therapy sessions with the daughter and respondents. During those sessions, respondents tended to blame the daughter for the children's removal. Near the end of August 2018, the family therapy sessions were terminated at the daughter's request. The daughter believed that respondents had not changed, and she was upset with what she perceived as their failure to take "responsibility for their behaviors." Thereafter, the daughter consistently maintained that she wanted to "move on" and have no further contact with respondents.

Petitioner subsequently filed a supplemental petition seeking termination of respondents' parental rights. In October 2018, the children's lawyer-guardian ad litem (LGAL) moved to suspend further visits between respondents and the minor children pending a dispositional hearing concerning termination. Two caseworkers—Fisher and Danielle Mankin—testified in support of the LGAL's motion, stating that suspension of further visits would best serve the children's interests and noting that the daughter had refused to participate in any further visits with respondents. Fisher noted that the son was excited for visits but that the visits also seemed to cause him anxiety. The trial court granted the LGAL's motion to suspend visitation pending a hearing concerning termination.

By the December 2018 review hearing, respondents had obtained a new home, which petitioner deemed to be appropriate. At the parties' agreement, the proceedings were adjourned to give the children an opportunity to visit the home. The visit took place either on or around Christmas 2018. Although respondent-mother believed that the visit went well, the daughter informed Kilcherman that she was "very upset" because respondents had made "promises" to her that were "contingent on her . . . coming home."

In January 2019, the daughter gave Kilcherman a letter in which the daughter made allegations of inappropriate sexual behaviors in the past involving herself, respondents, and several of her older brothers. Kilcherman believed that the daughter's allegations were genuine and not a contrived means of seeking termination of respondents' parental rights.

At the May 2019 review hearing, Kilcherman testified that the daughter had made significant progress since entering foster care. Before her removal, she had been suicidal. Since removal, her general hygiene had improved "tenfold." She had also lost significant weight, stopped wetting the bed, "become successful in school," gained confidence, increased her social interaction with peers, garnered "a few friends," developed better "coping skills," and joined the school marching band. Kilcherman opined that the daughter was capable of making "informed and responsible decisions about where she wants to live," and she noted that the daughter had made seemingly credible threats on more than one occasion that she would run away from home if she was returned to respondents. The daughter was angry with respondents, and Kilcherman believed that she would suffer behavioral, physical, and emotional regression if she was forced to return to respondents against her will. According to Kilcherman, the daughter required permanency, and her uncertainty in that respect was holding her back from achieving further progress.

The son's Board-Certified Assistant Behavior Analyst, Megan Keyes, testified that she was tasked with developing programming to assist the son with his autism-related skill deficits, and that she had been working with the son for about a year and a half. Such programming included family training involving the foster parents, and Keyes indicated that the son "was really lucky with the foster parents he got" because the foster mother had been proactive about autism treatment even before the son was referred for services. The foster parents had also successfully potty-trained the son. According to Keyes, the son was in the fifth grade and functioning at a kindergarten or first-grade level academically, but he had made significant progress while working with Keyes.

Family support specialist Celia Anderson supervised several of respondents' visits with the children from October 2017 through August 2018 until the daughter asked to stop the family therapy sessions. Anderson opined that the visits went well and respondents acted appropriately. In particular, over time respondents had begun to bring healthier meals and snacks for the children, and they were better at monitoring the children's portion sizes. The children generally seemed reluctant to leave the visits that Anderson observed, and there seemed to be a solid parent-child bond.

The foster mother testified that the children had been placed in her home since April 2017. The daughter had bonded with one of the foster family's daughters, who was around the same age as her. The foster mother confirmed that Anderson and Fisher had supervised different visits, and she stated that the children showed some regression and behavioral issues following visits with respondents. The daughter would overeat following visits, and the son often seemed withdrawn or angry afterward. During one visit in particular, which followed an upsetting family therapy session, the daughter had become emotional and asked to leave early. The foster mother confirmed that the daughter had threatened to run away from home if she was returned to respondents' home. The foster mother opined that reunification "would hurt the kids[.]"

On June 1, 2019, a police officer was dispatched to an adult foster care home where respondent-mother's adult son, who had autism, had previously resided. Respondents were attempting to remove "an old truck, . . . a snowmobile, and trailer" that belonged to respondent-mother's adult son. The officer informed respondents that they could not use the old truck to tow away the other equipment because the truck was unregistered and uninsured. The officer arrested

-4-

respondents after learning that they had outstanding arrest warrants for failure to pay fines. A few days later, the same officer received a report that respondent-mother's adult son had been seen removing the old truck from the adult foster care home. The officer located the old truck as it was being driven by respondent-father, who was towing the trailer and snowmobile. Respondent-mother was following him in respondents' car, with her adult son as her passenger. The officer attempted to initiate a traffic stop, but respondents refused to pull over and instead led the officer on a high-speed chase through a nearby town. Respondents were eventually apprehended and charged with fleeing or eluding a police officer, MCL 750.479a.

The termination hearing was held on two dates in July 2019. Dr. Timothy Strauss, a clinical psychologist, testified that he had performed clinical evaluations on respondents and both children in 2017. Respondent-father "reported that he had been in special education his whole life," had dropped out of high school, was unemployed, and was "on disability . . . , initially for learning problems but also physical problems." Respondent-father also reported "significant symptoms of depression"; he was unsure as to whether he may have been on any medication for depression and advised Dr. Strauss to ask respondent-mother about his medications. In general, respondent-father presented as "kind of a depressed, withdrawn, somewhat isolated person" with poor interpersonal skills and a "lower I.Q." Later testing revealed that respondent-father had an "extremely low" IQ score, falling in the bottom two percentile. Based on his cognitive deficits, Dr. Strauss opined that respondent-father would have difficulty parenting, particularly a child with special needs. Dr. Strauss diagnosed respondent-father with "major depression with anxious features" and "dependent personality disorder with schizoid traits." As a result of the borderline personality disorder, Dr. Strauss opined that respondent-father would "be passive in relationships . . . and have difficulty with attachment, and closeness, and empathy." Although Dr. Strauss recommended services for respondent-father, including further assessments, a medication review, and budgeting assistance, he believed that his prognosis was "very poor" because he would likely neglect his treatment. Dr. Strauss testified that personality disorders are "difficult to treat and take a year or two of therapy" and that respondent-father's low IQ was effectively untreatable.

Dr. Strauss's evaluation of respondent-mother revealed that she suffered from degenerative physical disabilities, including pain in her back and knees. She reported that she was on a "variety of medications," including antianxiety and antidepressant drugs, plus medications for pain, chronic headaches, and asthma. Respondent-mother also reported that she had previously been diagnosed with post-traumatic stress disorder. Dr. Strauss diagnosed respondent-mother with "generalized anxiety disorder," "a mixed personality disorder with dependent, avoidant and schizoid traits," "major depression with anxiety," and "an average I.Q." Respondent-mother also had difficulty budgeting. Like respondent-father, her personality tended to be "dependent," "withdrawn," and "rather passive[.]" Although Dr. Strauss recommended various therapies, budgeting assistance, and a medication review, he viewed respondent-mother's general prognosis as "poor." He testified that the prognosis for her "not to be a neglectful parent" as "very poor[.]" Dr. Strauss explained that personality disorders "just take a long time to treat," and "if you have special needs children it makes it very complicated to pull off and be fully functional as a parent." Indeed, respondent-mother had received similar diagnoses from a different doctor in 2014, and there had been no "significant . . . positive change[.]"

With regard to the minor children, Dr. Strauss noted that the son suffers from "severe autism." Dr. Strauss diagnosed the daughter with "generalized anxiety disorder," which is

common in children who have "separation anxiety." In Dr. Strauss's estimation, when he examined respondents in 2017, they lacked the capabilities to provide the son with the highly structured environment and the treatment plan that he required. They also lacked the initiative and motivation necessary to assist the daughter with achieving a regular routine, eating well, exercising, and maintaining proper hygiene. In sum, Dr. Strauss believed that children in respondents' care would suffer "a very high, long-term chronic risk for neglect[.]"

Fisher testified that she performed two home visits at the children's foster placement in the two months before the termination hearing. The children were "continu[ing] to do well" in that placement, with "no change in their behaviors." Fisher believed that respondents had failed to "benefit from certain services, particularly mental health services." She opined that—although the minor children loved respondents and were bonded to them—it would be in their best interests to terminate respondents' parental rights. Fisher noted the great progress the children had made in foster care, her belief that such progress would be jeopardized if reunification occurred, respondents' seeming inability to maintain stability and provide for the children's special needs, and the fact that the parent-child bond had seemingly weakened since the children entered foster care.

Mankin testified that respondents had demonstrated some benefit from the services they received and had maintained suitable housing for approximately the six months preceding the termination hearing. However, Mankin had doubts that respondents would be able to maintain housing over time. Respondents had been experiencing budgetary problems and had outstanding arrest warrants. Moreover, they had not adequately addressed their psychological problems, and the prognosis of full recovery was not encouraging. Although respondents had engaged in some counseling, they had been inconsistent in attending the sessions. In Mankin's view, although respondents seemingly loved the children, they had demonstrated that they were not capable of caring for their special needs.

Respondent-mother testified at the termination hearing and admitted that, at the time of adjudication, their home had been unsuitable for the children and that respondents had neglected them. Respondent-mother testified that respondents loved their children, and respondent-mother maintained that they had made great strides during the pendency of the case. Respondents were residing in a clean, appropriate home in a trailer park that was located in a safe neighborhood in Traverse City and had a play area for the children. Respondents had secured a housing voucher that paid 75% of their rent. They were paying their bills consistently and had developed a payment plan to pay off court fines that they owed. Also, the fleeing or eluding charges against them had been "discharged or dismissed," with respondent-father evidently entering a plea to serve three days in jail and pay a $300 fine for driving the truck without registration or proof of insurance. Respondents had also changed to healthier eating habits and planned to ensure proper nutrition and dietary restrictions for the minor children in the future. Respondent-mother was attending individual counseling sessions and joint counseling sessions with respondent-father, and she believed they were benefiting from counseling.[2] Also, they were taking prescribed psychoactive

---

[2] Respondent-mother denied that she had any type of personality disorder.

medications that helped with their psychological problems. Respondent-mother also believed that she had benefitted from parenting classes and budgeting services she had received during the case.

On cross-examination, respondent-mother admitted that, despite the psychological issues she had from being raised in an "extremely abusive home," she did not attend any individual counseling sessions from June 2018 to February 2019. Respondent-mother also admitted to having ongoing financial difficulties, to failing to pay court fines and costs, to further criminality on the part of respondent-father, and to the fact that her driver's license was either suspended or "expired and suspended." On the topic of the daughter's past bedwetting, respondent-mother suggested that it might have been done "on purpose," with the daughter intentionally urinating in her bed because she had been "[t]oo lazy to get out, . . . more busy watching her tv, or cutting up paper, or playing on her computer, or playing on her phone[.]"

At the outset of the termination hearing, there was a discussion about whether the then 15-year-old daughter would testify. Petitioner's attorney and the LGAL were opposed to her testifying because the daughter's therapist indicated it would be traumatic for her to testify in open court. However, respondents called the daughter as a witness. She testified that she and the son "get along just fine" with the foster family, and she thought the son had made quite a bit of progress in that placement. The daughter identified respondents by their full names, rather than referring to them as "mom and dad" or "mother and father." She indicated that respondents had neglected her and that she had been abused sexually, physically, and emotionally in their household. Conversely, her foster parents were supportive and provided a safe, clean home. The daughter also testified that she was no longer being bullied in school and had lost "a total of 72.5 pounds." The daughter felt strongly bonded with her foster family, and while she still "kind of" loved respondents, she wanted no further contact with them even if they were able to maintain a stable home environment. The daughter did not believe that respondents had meaningfully changed or that they were capable of providing proper care for her, and she would refuse to return to them regardless of the outcome of these proceedings. Instead, she wanted to remain in foster care. The son, however, continued to inform the daughter that he wanted to "go home" to respondents. She attributed this to his lack of understanding.

The trial court permitted the daughter to read two prepared statements, which summarized her feelings as follows:

> I grew up in a house of dog and chicken feces all over the house and never knew how to bathe, never had friends, hopping house to house. Now, I have a lot of friends that support me. I smell like laundry detergent and soap. I love school to death and I'm on the Honor Roll for the second year in a row. And this is also my cleanest house I've ever lived in.

> * * *

> So, when I was raised with my parents I felt like, just thinking about it right now, that I am very livid and disgusted about the question, why am here [sic] or why was I treated like this by my own parents? But, here's the thing, children should not be treated like pets out of a dumpster, basically. Especially by their siblings. Even parents know how to treat their kids, and no one has dog feces or

-7-

chicken feces, especially under a truck topper, in the living room. And I was always the one who cleaned it up. So, my basement was smelling like bleach all the time because it was the last minute before the cop came in the house to inspect the basement to see if it was still a safe place. And I didn't know how to bathe. And my life was horrible because I was always bullied by popular kids every day of my life. And it wouldn't stop. And I had an older brother . . . who forced me to watch porn. And he also called me a lesbian. So, I didn't know what that meant. . . . And we kept getting evicted. They never paid bills or taxes. We always went to amusement parks for only fun. And I—every time I was bullied, and I told them about it, they were not supportive at all. And I never knew what foster care was until now and I absolutely love it. I think its heaven for me, basically, because I'm in a family that supports me. They welcomed me into their home. They take care of all the bullies that I have in my way. And they're just very protective.

During closing arguments, the LGAL indicated that he believed it was vital for the trial court to terminate respondents' parental rights in order to afford the children permanency. He also argued that the trial court should disregard the son's stated desire to return to respondents given the son's limited capacity to reach a rational decision in that respect. After considering the evidence on the record at substantial length, the trial court found that statutory grounds for terminating respondents' parental rights had been established under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and that termination of their parental rights was in the children's best interests. This appeal followed.

## II. ADJUDICATION

Respondents first argue that, when accepting their pleas to establish the trial court's jurisdiction over the children, the trial court erred by failing to properly advise them of all of the consequences as required by MCR 3.971(B). More specifically, respondents contend that the trial court failed to comply with MCR 3.971(B)(4) by failing to advise them that their pleas could be used against them during subsequent termination proceedings. Respondents did not move to withdraw their pleas in the trial court or otherwise object to the advice of rights that they were provided. Thus, this issue is unpreserved. See *In re Zelzack*, 180 Mich App 117, 126; 446 NW2d 588 (1989) (where the respondent did not argue in the trial court that he should be allowed to withdraw his plea, and therefore, the trial court never addressed the issue, "the issue was not preserved for appeal").

Both this Court and our Supreme Court have applied the plain-error standard set forth in *People v Carines*, 460 Mich 750; 597 NW2d 130 (1999), to unpreserved claims of error arising out of child protective proceedings. See *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019); *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011). The *Carines* test "has four elements":

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) . . . the plain error affected substantial rights . . . [, and 4)] once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted . . . when the plain, forfeited error . . . seriously affected the fairness, integrity or public reputation of judicial

proceedings . . . . [*People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018), quoting *Carines*, 460 Mich at 763-764 (alterations and some ellipses in *Randolph*).]

"A 'clear or obvious' error under the second prong is one that is not 'subject to reasonable dispute.' " *Randolph*, 502 Mich at 10. An error has affected a party's "substantial rights when there is 'a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings.' " *People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019), quoting *Carines*, 460 Mich at 763. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Carines*, 460 Mich at 763 (quotation marks and citation omitted).

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). The family court determines whether to take jurisdiction of the child during the adjudicative phase. *Id*. The "fact-finding adjudication of an authorized petition to determine if the minor comes within the jurisdiction of the court" is called a "trial." MCR 3.903(A)(27). The term "trial" includes a "specific adjudication of a parent's unfitness," which subjects the parent to "the dispositional authority of the court." MCR 3.903(A)(27). A parent may also waive his or her right to a trial and admit the allegations in a petition or plead no contest to them. MCR 3.971(A); *In re Sanders*, 495 Mich at 405.

Pleas generally waive certain rights, and respondents' jurisdictional pleas in this case effectively waived, among other things, their rights to a jury trial, to cross-examine the witnesses against them, and to force petitioner to prove grounds for jurisdiction at a trial. See MCR 3.971(B)(3) (enumerating the rights that a respondent must be advised that he or she will waive by entering a jurisdictional plea). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v United States*, 397 US 742, 748; 90 S Ct 1463; 25 L Ed 2d 747 (1970). Hence, for a plea to constitute a valid waiver of constitutional rights, the person entering it must be made "fully aware of the direct consequences of the plea." *People v Cole*, 491 Mich 325, 333; 817 NW2d 497 (2012) (quotation marks and citation omitted). "A consequence is 'direct' where it presents 'a definite, immediate and largely automatic effect' on the defendant's range of punishment." *United States v Kikuyama*, 109 F3d 536, 537 (CA 9, 1997), quoting *United States v Wills*, 881 F2d 823, 825 (CA 9, 1989).

In the context of jurisdictional pleas in child protective proceedings, "[o]ur court rules reflect this due-process guarantee." *In re Ferranti*, 504 Mich at 21.[3] At the time respondents'

---

[3] Before *In re Ferranti* was released, our Supreme Court amended MCR 3.971 to require trial courts to inform a respondent that appellate review is available to challenge the "court's initial order of disposition," MCR 3.971(B)(6), and that the respondent "may be barred from challenging the assumption of jurisdiction in an appeal from the order terminating parental rights if [the respondent] do[es] not timely file an appeal of the initial dispositional order . . . ." MCR 3.971(B)(8). Additionally, in the event that a respondent is not informed that he or she is entitled

-9-

pleas were entered, MCR 3.971 provided, in relevant part, the following:

> (B) Advice of Rights and Possible Disposition. Before accepting a plea of admission or plea of no contest, the court must advise the respondent on the record or in a writing that is made a part of the file:
>
>> (1) of the allegations in the petition;
>>
>> (2) of the right to an attorney, if respondent is without an attorney;
>>
>> (3) that, if the court accepts the plea, the respondent will give up the rights to
>>
>>> (a) trial by a judge or trial by a jury,
>>>
>>> (b) have the petitioner prove the allegations in the petition by a preponderance of the evidence,
>>>
>>> (c) have witnesses against the respondent appear and testify under oath at the trial,
>>>
>>> (d) cross-examine witnesses, and
>>>
>>> (e) have the court subpoena any witnesses the respondent believes could give testimony in the respondent's favor;
>>
>> (4) *of the consequences of the plea, including that the plea can later be used as evidence in a proceeding to terminate parental rights if the respondent is a parent.* [Emphasis added.]

The record supports that the trial court advised respondents of *most* of the rights listed in MCR 3.971. However, contrary to MCR 3.971(B)(4), the trial court failed to advise them that their pleas could "later be used as evidence in a proceeding to terminate parental rights . . . ." A written advice of rights form containing such information does not appear in the record. Thus, by failing to properly advise respondents as required by MCR 3.971(B)(4) that their pleas could "later be used as evidence in a proceeding to terminate parental rights," the trial court erred.

However, with regard to the prejudice prong of the plain-error test, we conclude that respondents have failed to carry their burden of demonstrating that the adjudicatory error at issue in this case was outcome-determinative. More specifically, in *In re Ferranti*, 504 Mich at 30-31, our Supreme Court found error warranting reversal based on a finding that, because the trial court

---

to challenge a trial court's assumption of jurisdiction on appeal from the initial dispositional order, "the respondent may challenge the assumption of jurisdiction in an appeal from the order terminating [the] respondent's parental rights." MCR 3.971(C). The child protective proceeding at issue in this appeal was initiated in 2017, and respondents entered their pleas in April 2017.

failed to advise respondents of the rights they were waiving and the potential consequences of their pleas, the trial court violated their due process rights because the pleas were unknowing and involuntary. It was undisputed in that case that the trial court's advice of rights was deficient because the trial court failed to advise the respondents of "any" of the waived rights enumerated by MCR 3.971(B)(3) or (B)(4). *Id*. at 31.

MCR 3.971(B)(3) lists the rights that a parent waives by virtue of entering a plea, as opposed to requiring petitioner to proceed to trial and prove the allegations contained in the petition by a preponderance of the evidence. MCR 3.972(C)(1). The rights outlined in MCR 3.971(B)(3) are particularly important because they directly relate to the adjudicative stage of the child protective proceeding. The adjudicative stage is a critical stage in the proceeding because if the trial court exercises jurisdiction, then the parent will be unable to control the care and custody of his or her child, *In re Deng*, 314 Mich App 615, 626; 887 NW2d 445 (2016), and will be subjected to "the dispositional authority of the court," MCR 3.903(A)(27). See *In re Sanders*, 495 Mich at 405-406 ("While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights.") (quotation marks and citation omitted.). In contrast, if the trial court determines that it lacks authority to exercise jurisdiction, the minor child must be returned to the care of his or her parent(s). See MCR 2.514(A). See also MCL 712A.18(1) (providing that the trial court must dismiss the petition if it is found that the petition concerning the child at issue does not fall within the chapter). The importance of the adjudicative stage is reflected by the fact that it is the only stage of the proceeding when a parent is entitled to a trial. See also MCR 3.977(A)(3); *In re Sanders*, 492 Mich at 405-406. Thus, by failing to advise the respondents of the rights outlined in MCR 3.971(B)(3), the trial court in *In re Ferranti* effectively tainted the adjudicative stage of the proceeding.

This case does not feature the numerous errors that occurred in *In re Ferranti*. Respondents in this case only take issue with the fact that the trial court failed to advise them that their pleas could "later be used as evidence in a proceeding to terminate parental rights" as required by MCR 3.971(B)(4). Thus, unlike the parents in *In re Ferranti*, respondents in this case were informed of most of the rights that they were waiving, including their rights to a trial by judge or jury, to have witnesses against them appear, and to subpoena witnesses. Moreover, the transcript of the plea proceeding supports that respondents reviewed the allegations in the petition with their attorney, who represented them at the plea hearing. See MCR 3.971(B)(1) and (2). The record also supports that respondents discussed the allegations contained in the petition with their attorney and considered their decision. Respondents' attorney indicated the following at the hearing:

> I did speak at length with the Pedersons yesterday. We went over the petition, and picked out portions we believe that will allow the Court to take jurisdiction . . . . They are both in agreement with that.

> * * *

> I explained to them that they would have a right to a trial on the issue of jurisdiction before the Court or jury. They've agreed to waive those—or that right.

I've also went over [sic] the rights to have witnesses called and subpoena witnesses *and things of that sort*.[4] [Emphasis added.]

Each of the allegations that respondents were pleading to were read aloud at the hearing. Thus, respondents were clearly advised of the allegations to which they were pleading. Additionally, and importantly, respondents confirmed that they were entering pleas of their own free will. Specifically, before the trial court accepted respondents' jurisdictional pleas, the following line of questioning occurred:

> *Trial Court*: Is anyone, Ms. Pederson, twisting your arm to enter into this plea or are you doing it of your own free will?
>
> *Ms. Pederson*: My own free will.
>
> *Trial Court*: And Mr. Pederson?
>
> *Mr. Pederson*: My own free will.

Although respondents were not informed that their pleas could "later be used as evidence in a proceeding to terminate parental rights," respondents were informed on several occasions that, if the pleas were accepted, a consequence of their pleas would be that they would be required to comply with the case service plans. The record of the plea proceeding supports that respondents had reviewed the case service plans before the plea hearing. Furthermore, respondents were informed several times that another possible consequence of their pleas was that their parental rights could be terminated if they did not comply with the case service plans. Respondents indicated under oath that they understood this, thereby supporting that they understood the nature and the consequences of their pleas.

Thus, this is not a case involving a complete failure to address the requirements listed in MCR 3.971(B)(4). Furthermore, MCR 3.971(B)(4) relates to the dispositional phase of the proceedings—as opposed to the adjudicative phase—in that (B)(4) does not address the rights associated with an adjudication trial. Rather, MCR 3.971(B)(4) concerns how entering a plea at the adjudication stage could later be used against respondents during the dispositional phase. Thus, unlike in *In re Ferranti*, the adjudicative stage was not tainted by the trial court's failure to advise respondents of their rights under MCR 3.971(B)(4). Rather, respondents were aware that they were giving up the right to an adjudication trial before entering pleas.

Additionally, we conclude that the trial court's error did not affect the outcome of the dispositional phase of the proceedings. More specifically, in *In re Ferranti*, 504 Mich at 12, the trial court relied on two statutory grounds for termination: MCL 712A.19b(3)(c)(*i*) (conditions that led to the adjudication continue to exist) and MCL 712A.19b(3)(g) (parent is unable to provide proper care and custody). In addition to citing both of those grounds, the trial court in this case

---

[4] At oral arguments, respondents' appellate attorney, who was also respondents' trial attorney, indicated that he could not recall if he advised respondents that their pleas could be used against them during termination proceedings.

also relied on MCL 712A.19b(3)(c)(*ii*), under which termination may be appropriate on the basis of grounds "other" than those that led to the adjudication. See *In re JK*, 468 Mich 202, 210-212; 661 NW2d 216 (2003). As explained below, the trial court did not clearly err by finding that termination of respondents' parental rights was warranted under MCL 712A.19b(3)(c)(*ii*). Although respondents' pleas served to establish a statutory basis for jurisdiction, because only one statutory ground for termination need be established, *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), and because termination under MCL 712A.19b(3)(c)(*ii*) is, by definition, unrelated to the grounds that led to the adjudication, it follows that the adjudicatory error at issue here did not affect the decision to terminate respondents' parental rights.

Because we cannot conclude from the record that respondents' pleas were not knowingly and voluntarily made or that respondents' decision to plead affected the adjudicative or dispositional stages of the proceeding, we conclude that respondents have failed to carry their burden of demonstrating prejudice. See *Carines*, 460 Mich at 763.

Furthermore, even if we were to conclude that respondents' substantial rights were affected, respondents would not automatically be entitled to reversal. Rather, "[r]eversal is warranted . . . when the plain, forfeited error . . . seriously affected the fairness, integrity or public reputation of judicial proceedings." See *Randolph*, 502 Mich at 10. In this case, respondents have not argued that they would not have pleaded to some of the allegations in the petition had the trial court informed them that their pleas could be used as evidence against them if termination proceedings commenced.[5] Respondents were informed that their parental rights could be terminated if they did not comply with the case service plans. Before respondents entered their pleas, they had reviewed the case service plans and therefore knew what would be required of them. After respondents failed to comply with and benefit from the case service plans, termination proceedings were initiated. As discussed later, overwhelming evidence supported termination of respondents' parental rights pursuant to MCL 712A.19b(3)(c)(*ii*) and that termination was in the minor children's best interests. Based on this record, we conclude respondents are not entitled to relief under plain-error review.

### III. STATUTORY GROUNDS FOR TERMINATION

Respondents argue that the trial court clearly erred by finding clear and convincing evidence supporting the four statutory grounds cited in support of termination. We find no clear error warranting reversal.

We review for clear error the trial court's decision whether grounds for termination have been proven by clear and convincing evidence. *In re Medina*, 317 Mich App 219, 226; 894 NW2d

---

[5] Although the Court in *In re Ferranti*, 504 Mich at 30, made it clear that "constitutional deficiencies . . . are not forgiven by what might have transpired at [an adjudication] trial," we note that respondents faced overwhelming evidence against them. Had an adjudication trial been conducted, the trial court likely would have found that one or more of the statutory grounds alleged in the petition were proven by a preponderance of the evidence. See *Id.* at 61-62 (MARKMAN, J., dissenting).

653 (2016). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made," with the reviewing court "defer[ring] to the special ability of the trial court to judge the credibility of witnesses." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014) (citation omitted).

"To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App at 32. The clear and convincing evidence standard is "the most demanding standard applied in civil cases[.]" *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995). Evidence is clear and convincing if it

> produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. [*Id*. (quotation marks, citation, and brackets omitted.]

"Evidence may be uncontroverted, and yet not be 'clear and convincing.' " *Id*. (quotation marks and citation omitted). "Conversely, evidence may be 'clear and convincing' despite the fact that it has been contradicted." *Id*. (quotation marks and citation omitted).

The trial court found that grounds for terminating respondents' parental rights were established under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), which authorize termination under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> \* \* \*

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> \* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

In our estimation, Subsection (3)(j) provides the best support for termination. For purposes of that subsection, the harm in question need not be physical; a "risk of *emotional* harm" can suffice. See *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). On this record, the trial court did not clearly err by determining that there was clear and convincing evidence that there was a reasonable likelihood, based on the conduct or capacity of respondents, that the minor children would suffer emotional harm if they were returned to respondents. The daughter was steadfastly opposed to reunification, and both of the children had thrived in foster care. Dr. Strauss's expert opinion, which was not controverted by any other expert testimony, was that it would take respondents years to address their psychological issues under optimal circumstances. Dr. Strauss further opined that respondents' prognoses were rather poor even with treatment, that respondent-father's low IQ was irreversible, and that any child placed in respondents' care would suffer "a very high, long-term chronic risk for neglect[.]" Moreover, respondents were admittedly unable to work, which restricted their income, and they owed tens of thousands of dollars in outstanding debts. In an attempt to meet some of those obligations, they had financially exploited one of respondent-mother's disabled adult children, thereby demonstrating their willingness to sacrifice the best interests of their children for their own self-interest. Respondents also frequently found themselves incarcerated and fined for a variety of petty crimes. Time and again, respondents were unable to accept responsibility for their own actions. This was poignantly demonstrated when, at the termination hearing, respondent-mother suggested that the daughter might have intentionally wet her own bed—to the point that it had become so saturated with urine that the floorboards beneath were soaked—because she was simply too "lazy" to get up and go to the bathroom. In sum, there was ample evidence for the trial court to conclude that there was a reasonable likelihood, based on the conduct or capacity of respondents, that the minor children would suffer emotional harm if they were returned to respondents.

For the same reasons that termination was appropriate under Subsection (3)(j), it was also appropriate under Subsection (3)(c)(*ii*). Respondents acknowledge that they were respondents in a child protective proceeding and, before termination occurred, 182 or more days had elapsed since issuance of the initial dispositional order. Moreover, the conditions discussed above with regard to Subsection (3)(j)—respondents' mental problems, their prognoses, and their recurring legal problems—are all conditions "other" than those that led to the adjudication because respondents made no admissions concerning those conditions in their jurisdictional pleas. Although the evidence establishes that respondents were afforded a reasonable opportunity to rectify these conditions through services, respondents failed to do so. Moreover, in light of Dr. Strauss's testimony, the trial court did not clearly err by finding that there was no reasonable likelihood that respondents would be able to rectify these conditions within a reasonable time given the ages of the children. Accordingly, we find no clear error with regard to Subsection (3)(c)(*ii*).

Having decided that termination was properly granted under Subsection (3)(j) and Subsection (3)(c)(*ii*), it is unnecessary to consider or decide respondents' claims of error concerning the other disputed grounds. See *In re Ellis*, 294 Mich App at 32 ("Only one statutory ground need be established . . . to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds.").

-15-

## IV.  BEST INTERESTS

Respondents also argue that the trial court erred by finding that termination of their parental rights was in the children's best interests.  We disagree.  The trial court's best-interest determination is also reviewed for clear error.  *In re Medina*, 317 Mich App at 226.

MCL 712A.19b(5) provides, "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made."  As explained in *In re Medina*, 317 Mich App at 237:

> Although a reviewing court must remain cognizant that the fundamental liberty interest of natural parents in the care, custody, and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State, at the best-interest stage, the child's interest in a normal family home is superior to any interest the parent has.  Therefore, once a statutory ground for termination has been established by clear and convincing evidence, a preponderance of the evidence can establish that termination is in the best interests of the child.  [Quotation marks, citations, and brackets omitted.]

"In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party."  *Id*. (quotation marks and citation omitted).

> [T]he court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.  The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption.  [*In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014).]

In support of their argument that the trial court erred by concluding that termination of their parental rights was in the children's best interests, respondents cite the parent-child bonds that existed in this case, and contend that "[i]n the long run termination of these bonds will be traumatic and not in the children's best interest."  This argument ignores that because of respondents' neglect, the parent-child bond had already been transformed into something that has traumatized the children.  In *In re Medina*, 317 Mich App at 240, this Court addressed a similar argument as follows:

> Respondent argues that "[k]nowing who one's biological father is and having a relationship with him have intrinsic value."  In a utopian world, that might be true.  But ours is an imperfect world, and the "value" a child derives from the parent-child relationship is not, as respondent suggests, universally positive; if it were, there would be little need for child protective proceedings.

In other words, the parent-child bond is a blade that is capable of cutting both ways; whether it benefits or harms a child depends on how the parent wields it. In this case, respondents' neglect over the course of years turned the parent-child bond into something emotionally harmful, and further contact with respondents will likely only prevent the children's psychological wounds from healing. Indeed, the 15-year-old daughter has consistently indicated that she would run away from home if forced to return to respondents. Consequently, respondents do not have an appropriate parent-child bond with the minor children.

Respondents' argument is also myopic, focusing on the parent-child bond to the exclusion of all else. Considering all of the other pertinent factors and the evidence on the whole, we are not definitely and firmly convinced that the trial court made a mistake with regard to its best-interest determinations. Both children have flourished in foster care, and the foster mother indicated that the foster family was interested in adopting the children if respondents' parental rights were terminated. Given the length of these proceedings, the children's ages, and their special needs, they are in desperate need of stability and permanency, which the foster family has been able to provide. Although respondents were able to secure appropriate housing during the proceeding, they have a long track record of evictions, unpaid debts, mental illness, criminality, and neglect. Moreover, Dr. Strauss indicated that their psychological problems made them far-from-effective parents, particularly for children with special needs. Thus, the children would not have been safe in respondents' care. See *In re VanDalen*, 293 Mich App at 141. For those reasons, we are convinced that the trial court's best-interest determination was not clearly erroneous.

Affirmed.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ Brock A. Swartzle